# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

JOHN BROWN,

                        Plaintiff,

      v.                                  5:14-CV-725
                                               (MAD/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

---

JAYA A. SHURTLIFF, ESQ., for Plaintiff
GRAHAM MORRISON, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On, March 2, 2011, plaintiff protectively[1] filed an application for Disability Insurance Benefits ("DIB"), and an application for Supplemental Security Income ("SSI"), alleging disability beginning December 27, 2010. (Administrative Transcript ("T") at 13, 102-107, 108-114). The applications were denied initially on June 2, 2011.

---

[1] The term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. If a statement meeting the requirements of the regulations is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date. Although the plaintiff's application itself does not indicate the protective filing date, his "Disability Determination and Transmittals" indicate, and all parties agree, that the "Filing Date" was 3/01/11, even though the applications themselves state that the filing date is March 10, 2011. (T. 51-54, 102-114)

(T. 53-54, 55-58).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on August 6, 2012. (T. 30-52).  At the hearing, held by video-conference, the ALJ took plaintiff's testimony and the testimony of Vocational Expert ("VE") Jay Steinbrenner. (*Id.*)  On March 5, 2013, ALJ Andrew Henningfeld found plaintiff was disabled from December 27, 2010 until October 31, 2012, but that his disability ended as of November 1, 2012. (T. 13-23).  ALJ Henningfeld's  decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on May 8, 2014. (T. 1–7).

## II.  GENERALLY APPLICABLE LAW

### A.  Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859

F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony).  However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## B.     Standard for Initial Award and Termination of Benefits

A plaintiff seeking disability insurance benefits or Supplemental Security Income ("SSI") disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a) (3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

3

In an initial determination of disability, the Commissioner uses a five step

analysis. 20 C.F.R. § 404.1520.

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not,
> the Commissioner next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities. If the claimant
> suffers such an impairment, the third inquiry is whether, based
> solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in
> Appendix 1 of the regulations. If the claimant has such an
> impairment, the Commissioner will consider him [per se]
> disabled . . . . Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual functional
> capacity to perform his past work. Finally, if the claimant is
> unable to perform his past work, the Commissioner then
> determines whether there is other work which the claimant
> could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from performing

his past work, there is a "limited burden shift to the Commissioner" to "show that there

is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d

303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

The regulations provide that after the Commissioner makes a finding of

disability, this finding is evaluated "from time to time"[2] to determine if the claimant is

still eligible. *See* 42 U.S.C. § 423(f); 20 C.F.R. §§ 404.1590, 404.1589. To determine

---

[2] Section 404.1590 provides when, and how often, the Commissioner will conduct the this
evaluation.

whether a claimant's disability has ended, the Commissioner has developed a multi-step[3] analysis, known as the "Continuing Disability Review" ("CDR") process. 20 C.F.R. § 404.1594(f). Termination of benefits may occur when there is substantial evidence to show that a "medical improvement" ("MI") restores the recipient's ability to work. *Deronde v. Astrue*, No. 7:11-CV-998, 2013 WL 869489, at *2 (N.D.N.Y. Feb. 11, 2013) (citing inter alia 20 C.F.R. § 1594; *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2003)). MI is defined as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [he or she was] disabled or continued to be disabled." *Id.* (citing inter alia 20 C.F.R. § 404.1594(b)(1)). The Commissioner must compare the current medical severity of plaintiff's impairment to the severity of that impairment at the time of the most recent favorable decision. *Douglass v. Astrue*, 496 Fed. App'x 154, 155 (2d Cir. 2012) (citing *Veino*, 312 F.3d at 586-87). This concept is referred to as the "point of comparison." 20 C.F.R. § 404.1594(b)(7).

The multi-step analysis is as follows:

(1)     Is the plaintiff engaging in substantial gainful activity ("SGA"). If so, the Commissioner will find that the disability has ended.

(2)     If not, the Commissioner determines whether the plaintiff has an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1 of Part 404 ("Listed Impairment). If so, the disability will continue.

---

[3] Section 1594 is entitled "How we will determine whether your disability continues or ends," and the section contains a lengthy discussion of how the Commissioner periodically reviews favorable disability determinations for medical improvement ("MI"). The section includes definitions of various terms, together with examples. *See* 20 C.F.R. § 1594(b)(1)-(b)(7). The evaluation steps referred to above are listed in section 1594(f).

(3)     If not, the Commissioner determines whether there has been MI as defined in 20 C.F.R. § 404.1594(b)(1).

(4)     If there has been MI, the Commissioner determines whether the MI is related to the plaintiff's ability to work under 20 C.F.R. § 404.1594(b)(1) through (b)(4).

(5)     If there has been no MI, or the MI is not related to the plaintiff's ability to work, the Commissioner determines if any of the "exceptions"[4] in paragraphs (d) and (e) apply.

(6)     If there has been MI or one of the first group of exceptions to MI applies, the Commissioner will determine whether all the plaintiff's current impairments are "severe."

(7)     If plaintiff's impairments are severe, then the Commissioner will assess the plaintiff's RFC, based on all the current impairments, and determine whether the plaintiff can perform his or her prior work.  If so, disability will cease.[5]

(8)     If the plaintiff cannot perform his or her prior work, then the Commissioner will consider whether the plaintiff can perform other work

---

[4] There are two groups of "exceptions" to the requirement for MI. 20 C.F.R. 404.1594(d) and (e).  These exceptions allow the Commissioner to terminate benefits even if there has been no MI.  The first group of exceptions deal with the availability of advances in medical or vocational therapy, related to a claimant's ability to work (§ 404.1594(d)(1)); substantial evidence that the plaintiff has undergone vocational therapy related to his or her ability to work (§ 404.1594(b)(2)); new or improved diagnostic techniques show that the claimant's impairment was not as disabling as it was considered at the time of the most recent favorable decision (§ 404.1594(d)(3)); substantial evidence demonstrates that the most recent favorable decision was made in error (§ 404.1594(d)(4)); or plaintiff is currently engaging in SGA and is not entitled to a trial work period pursuant to section 404.1592.  The second group of exceptions to the necessity for MI include whether a prior favorable determination was obtained fraudulently (§ 404.1594(e)(1)); plaintiff fails to cooperate pursuant to section 404.911 (§ 404.1594(e)(2)); the Commissioner is unable to find the plaintiff (§ 404.1594(e)(3)); or the plaintiff fails to follow prescribed treatment which would be expected to restore his or her ability to perform SGA (§ 404.1594 (e)(4)).

[5] This regulation also provides that if there is insufficient evidence of a plaintiff's past relevant work to make the determination under this subsection, the Commissioner will proceed to the final step of the analysis. 20 C.F.R. § 404.1594(f)(9).

in the national economy, based upon the plaintiff's age, education, and past work experience.  If so, disability will cease.  If not, disability will continue.

20 C.F.R. § 404.1594(f)(1)-(f)(8) *cited in Deronde*, 2013 WL 869489 at *2 n.8.  These steps are intended to assure that the review of disability cases is conducted in a uniform manner, and that "any decisions to stop disability benefits are made objectively, neutrally and are fully documented." *Deronde*, 2013 WL 869489 at *2 (quoting 20 C.F.R. § 404.1594(f)).

Pursuant to this multi-step standard, the Commissioner has the burden of persuasion in showing that MI has occurred.[6] *Abrams v. Astrue*, No. 06-CV-689, 2008 WL 4239996, at *2 (W.D.N.Y. Sept. 12, 2008) (citing *Suriel v. Comm'r of Soc. Sec.*, No. CV-05-1218, 2006 WL 2516429, at *4 (E.D.N.Y. Aug. 29, 2006); *Lopez v. Barnhart*, 3:05-CV-19, 2006 WL 1272644, at *2 n.2 (D. Conn. Mar. 1, 2006)).  If the Commissioner reaches the eighth step, the Commissioner has the limited burden to show that there is other work that the plaintiff can perform in the national economy. *See* 20 C.F.R. § 404. 1594(b)(5) ("[i]n most instances, *we must show* that you are able to engage in [SGA] before your benefits are stopped." (emphasis added)).

---

[6] In *Deronde v. Astrue*, the court stated that under this analytical model, "the burden rests with the Commissioner at every step." 2013 WL 869489, at *3.  However, there are other cases in which the court states that the "'medical improvement standard requires the Commissioner to meet a burden of showing, by substantial evidence, that a medical improvement has taken place in a claimant's ability to perform work activity.'" *Chavis v. Astrue*, No. 5:07-CV-18, 2010 WL 624039, at *4 (N.D.N.Y. Feb. 18, 2010) (quoting *Mumm v. Comm'r of Soc. Sec.*, No. 5:06-CV-989, 2008 WL 686787, at *9 (N.D.N.Y. Mar. 10, 2008)).  The "medical improvement" step of the analysis is only the third step.  It is unclear whether the plaintiff bears the burden in between MI and the last step, where the burden is again shifted, by the regulation itself, to the Commissioner to show that plaintiff can perform other SGA.

III. **FACTS**

Plaintiff was born on June 11, 1973 and was thirty-nine years old at the time of the ALJ hearing. (T. 31). Plaintiff was 5'5" and weighed 210 pounds. (T. 32). Plaintiff completed the eleventh grade in school and then obtained his General Equivalency Diploma ("GED"). (T. 32). His most recent prior work experience was as a hazardous waste cleaner for Apex Environmental Services. (T. 33). The job involved cleaning chemical spills, demolition work, swinging a sledge hammer, and running a jack hammer. (*Id.*) He left that work after a car accident rendered him unable to perform the duties associated with the job. (T. 33).

Plaintiff testified that after the car accident, his injury did not seem very severe, but as time went on, his back got worse, and he finally had back surgery. (T. 34). The surgery alleviated the sharp pain that ran down his leg and the "immediate pain" in his back. (*Id.*) However, plaintiff stated that he still has a steady pain in the center of his back and has developed numbness in his left leg. (*Id.*) He takes Oxycodone for the pain, four times daily. (*Id.*) He had not taken any Oxycodone prior to the hearing because he had to drive to the hearing. (*Id.*) Plaintiff testified that he drove to the hearing and that half an hour was the most he had ever driven since the accident. (T. 34).

Plaintiff stated that the medication helps with the pain, alleviating it to the point where he can "lay there." (T. 35). Plaintiff testified that after the surgery, the "major," "unbearable" pain was gone, but he did not see any further improvement. (T. 35). Physical therapy did not work. (*Id.*) Plaintiff also stated that he smoked cigarettes, and

his that physicians told him to stop. Plaintiff stopped for six months after surgery, but "after no improvement and the amount of stress [he] was under, [he] started back up again." (*Id.*)

Plaintiff stated that he really wanted to return to work, and that he tried to do various things in an effort to see if he could work. (T. 36). Plaintiff stated that he attempted to help his father-in-law work on his house. Plaintiff testified that he could mow the lawn, but "for hours, if not days, afterwards" he would be laid up in bed. (*Id.*) Plaintiff also told the ALJ that plaintiff was uncomfortable "just sitting" at the hearing, and felt as if he had to "adjust constantly." (*Id.*) The ALJ then asked plaintiff how he spent his time, and plaintiff stated that he stayed busy around the house, did some house work and walked around, changing positions throughout the day. (T. 37). He can do "normal" household chores. He can do the dishes, but cannot put them away; and he plays video games with his five year old. He has tried to go fishing with his family, but ends up spending most of the time in the truck, watching them fish or reclining and listening to music until the pain subsides. (*Id.*) In response to his attorney's questions, plaintiff testified that he used to play basketball, fish, and do carpentry, but he cannot do any of those activities any more. (T. 38).

Plaintiff testified that he told his surgeon that he was still having pain and discomfort, despite the surgery. (T. 39). Plaintiff stated his surgeon prescribed the nerve blocks, and that after the nerve blocks were "done," plaintiff would go back to his surgeon and determine a "new plan of action." (*Id.*) Plaintiff testified that he was getting nerve blocks at "New York Spine and Wellness." (T. 38) His last nerve block

9

was July 10, 2012, approximately one month prior to the hearing, and he had a block previously in May of 2012. (T. 38-39).

Plaintiff testified that he could only sit for approximately 30 to 45 minutes at a time before he has to stand up.  He testified that he could pick things up off the floor when he is seated, but he could not pick anything up off the floor from a standing position. (T. 39)  Plaintiff testified that he has walked "two blocks and back" with mild discomfort, but after he walks, he gets pain behind his left leg, and he must lay in bed for an hour after walking. (T. 40).  Plaintiff drove the hearing, which required him to sit in the car for twenty-five minutes, and he parked a block from the hearing office. Plaintiff testified he did not take his Oxycodone because the side effects will not allow him to drive. (T. 40).  The other side effects from his medications include feeling "wired" and light-headed. (*Id.*)  Plaintiff stated that when he was taking his medications, he would not be able to follow instructions "effectively." (T. 41).

Plaintiff stated that his pain level is a five-out-of-ten daily, even with his Oxycodone. (*Id.*)  Plaintiff states that sometimes when he gets out of bed, the pain is so bad that he "will absolutely buckle," and his girlfriend will have to come in and help him get up. (*Id.*)  His surgeon prescribed a cane for plaintiff. (*Id.*)  Plaintiff stated that sometimes "the pain is so unbearable [he cannot] even watch TV." (*Id.*)  When this happens, he must cover his face and lay down. (T. 42).  Plaintiff testified that this happens "once every couple of weeks." (*Id.*)  Plaintiff also stated that if he has taken his Oxycodone, he would not be able to sit and work at a computer because he cannot get his eyes to focus properly on the screen. (*Id.*)

The ALJ heard testimony from Jay Steinbrenner, a VE. (T. 42-52). After discussing plaintiff's prior work and determining that he could not return to his former occupations, the VE answered the ALJ's hypothetical question. (T. 46-49). The ALJ asked the VE to assume that someone of plaintiff's age education and prior work experience was limited to sedentary work, with no climbing of ladders, ropes or scaffolds; no more than occasional climbing of ramps or stairs; no more than occasional stooping, crouching, kneeling, or crawling; can understand, carry out, and remember no more than a few simple instructions; can do routine, repetitive work, involving only a few, if any, changes in the work setting; and may not work around hazards, such as dangerous moving mechanical parts or machinery; and my not work in high exposed places. (T. 46).

The VE testified that there would be "a couple of positions" that someone with those limitations could do. (*Id.*) Those jobs would be "ticket seller," "telephone survey worker," and telephone or switchboard operator. (T. 46-47). The ALJ asked whether an individual could still perform these jobs if he required a "sit/stand" option and could only do one or the other for thirty minutes at a time. (T. 49). The VE testified that those jobs would still be available to the individual. (*Id.*) Then the ALJ asked questions about "employer tolerance levels." (*Id.*) The VE testified that an employee must attend 90% of his or her scheduled work time, which would translate in missing only two or three days per month. (*Id.*) The VE also testified that an individual would be entitled to 45 minutes for lunch and two 15 to 20 minute breaks during the work day. (T. 50). The individual would only be entitled to be "off task" for 20% of the day. To sustain

11

employment, an individual would normally have to produce 85% or above what is expected for the job. (*Id.*) The VE testified that if an individual were to be "off-task" consistently for more than 20% of the time, there would be no jobs that he could perform, because it would lead to "termination." (*Id.*)

There are a substantial number of medical records in this case, including some that were submitted after the ALJ's decision and were considered by the Appeals Council. (T. 186-459 (records before the ALJ), 460-69 (records submitted to Appeals Council)). However, rather than detailing the medical evidence at the outset, relevant details regarding the medical and other evidence, including the medical opinion evidence, are discussed below as necessary to address the issues raised by plaintiff.

## IV. <u>ALJ'S DECISION</u>

The ALJ in this case found that plaintiff was disabled between December 27, 2010 until October 31, 2012, but that his disability ceased on November 1, 2012. (T. 13). At step two of the sequential analysis, the ALJ found that plaintiff suffered from two severe impairments – back disorders and obesity, but these impairments were not severe enough to meet the requirements of a Listed Impairment at step three. (T. 17). The ALJ then found at step four that, from December 27, 2010 until November 1, 2012, plaintiff could perform sedentary work with the postural limitations cited above, but that he would be required to take "unscheduled breaks taking him off-task more that 15% of the day on a regular and recurring basis." (*Id.*) The ALJ found that plaintiff's statements concerning the "intensity, persistence and limiting effects of [his] symptoms are generally credible from December 27, 2010 through October 31, 2012." (T. 18).

The ALJ noted plaintiff's extensive treatment history and his "consistent complaints" throughout the record, which tended to "bolster the credibility of a claimant's subjective allegations." (*Id.*)  In addition, the ALJ found that the objective medical evidence and opinion evidence supported disabling limitations. (*Id.*)

The ALJ found that during the relevant time period, plaintiff was "unable to maintain a full-time competitive work schedule." (*Id.*)  The ALJ cited reports by Dr. Thomas Haher, M.D., plaintiff's treating spinal specialist and surgeon, giving them significant weight. (*Id.*)  Examination notes showed numbness in the lower extremities, radicular pain, and motor weakness.  After conservative treatments, such as physical therapy and nerve blocks failed, plaintiff had a laminectomy and fusion surgery at L5-S1 in July of 2011. (*Id.*)  Dr. Haher found that plaintiff was unable to work as early as January 2011.  However, even after the surgery, plaintiff's back pain returned, despite continued physical therapy, injections, and medication. (T. 18.)

The ALJ considered, but gave lesser weight to, the reports of Nurse Practitioner ("NP") Mark A. Profetto because he is "not an acceptable medical source." (T. 18).  Examining orthopedic surgeon, Dr. Richard J. Mutty opined that plaintiff was able to perform sedentary work between February 2011 and November 2011, but that as of November 2011, plaintiff could perform sedentary and light work.  However, the ALJ gave Dr. Mutty's opinions limited weight because they were inconsistent with those of the treating physician and did not reflect the evidence as a whole during the relevant period. (*Id.*)  The ALJ also afforded limited weight to the consultative opinion to Kalyani Ganesh, M.D., a consultative examiner.  Dr. Ganesh opined only that plaintiff

would have a "moderate degree" of limitation in standing, walking, climbing, lifting, carrying, pushing, pulling, and handling. (*Id.*)  The ALJ gave this opinion "limited weight" because it represented "only a snapshot of the claimant's abilities, and was inconsistent with the treating source's opinion during the relevant period. (*Id.*)

The ALJ gave limited weight to the non-examining consultant – R. Fletcher, who opined that plaintiff could perform light work, and the ALJ gave limited weight to the assessment of John Jablonka, a non-examining "Senior Assessment Specialist." (T. 19). Due to plaintiff's consistent debilitating pain, supported by objective evidence and treating source medical opinions, the ALJ found that plaintiff would require unscheduled breaks in excess of customary employer tolerances.  Furthermore, the ALJ placed limitations on climbing, stooping, crouching, kneeling, and crawling. (*Id.*)  "To account for the mental effects of physical pain, as well as any medication side effects," the ALJ limited plaintiff to simple, routine, and repetitive tasks in an environment free from hazards. (*Id.*)

At step four, the ALJ also found that plaintiff could not perform any of his past relevant work from December 27, 2010 to October 31, 2012. (*Id.*)  Finally, at the final step, the ALJ found that plaintiff's ability to perform the "full-range" of sedentary work was impeded by these additional limitations. (T. 20).  The ALJ cited the VE's opinion that given all the limitations imposed by plaintiff's impairments, there were no jobs that plaintiff could have performed during the relevant period. (*Id.*)

The ALJ then turned to the time period beginning November 1, 2012 and found that medical improvement occurred as of that date. (T. 20).  The ALJ stated that after

14

exhibiting "some degree of improvement for several months," plaintiff's November 2012 examination supported a finding that plaintiff was not longer disabled. The report in question indicated that after plaintiff had received a series of injections, he reported improvement in his ability to walk for longer periods of time as well as sit more comfortably. (*Id.*) Plaintiff had a normal gait, and a "largely unremarkable" physical examination. "Moreover, the treatment provider made no indication that Brown was limited in his ability to work." (*Id*.)

The ALJ stated that he "compared" plaintiff's Residual Functional Capacity ("RFC") for the period during which he was disabled, and his RFC beginning November 1, 2012, and found that plaintiff's RFC had increased. (T. 21). The ALJ then repeated plaintiff's RFC for sedentary work, with the same postural limitations cited above, but did not include the fact that he would have to be "off-task" for more than 20% of the work day. (*Id.*) The ALJ found that plaintiff was "not entirely credible" and that there was evidence of "non-compliance" with his doctor's advice to quit smoking. (*Id.*)

The ALJ stated that, beginning November 1, 2012, the treatment records no longer support plaintiff's allegation of disabling limitations, and that even before November 1, 2012, plaintiff had begun to show signs of improvement. The ALJ stated that in May of 2012, plaintiff drove 20 miles to his doctor's appointment, "suggesting that he could sit for and extended period." The provider noted a normal gait, negative straight leg raising, and that plaintiff sat comfortably. The ALJ further noted that in May of 2011, the "consultative examiner" found no sitting limitations. By November

1, 2012, plaintiff had received a new series of nerve block injections and reported improvement in his ability to walk for longer periods and sit more comfortably. (*Id.*) The ALJ stated that the "provider" observed a normal gait and noted no functional limitations in plaintiff's ability to work. Based on these findings, the ALJ concluded that the treatment records showed improvement and supported a finding that plaintiff could perform a reduced range of sedentary work. (T. 22).

The ALJ continued to find that plaintiff could not perform his prior work and repeated his prior RFC, without the portion that referred to plaintiff being "off-task" for more than 20% of the work day. (T. 22). Without this limitation, the ALJ found that, beginning November 1, 2012, based on the VE's testimony, there were jobs that plaintiff could perform, including ticket seller, telephone survey worker, and telephone switchboard operator. (T. 23). The ALJ noted that these jobs would still be available to an individual who would have to alternate sitting and standing every thirty minutes. (*Id.*) Thus, the ALJ found that plaintiff's disability ceased as of November 1, 2012. (*Id.*)

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

(1)    The ALJ erred in finding that plaintiff was not disabled as of November 1, 2012. (Pl.'s Br. at 11-16) (Dkt. No. 10).

(2)    The ALJ erred in assessing plaintiff's credibility. (Pl.'s Br. at 16-19).

(3)    The ALJ erred at step five because the hypothetical question posed to the VE was not a complete and accurate portrayal of plaintiff's limitations. (Pl.'s Br. at 19-21).

Defendant argues that the Commissioner's determination is supported by substantial

evidence and should be affirmed.  For the following reasons, this court agrees with the

plaintiff and will recommend reversing the Commissioner's decision and remanding for

further proceedings.

## VI.  MEDICAL IMPROVEMENT

### A.  Legal Standards

Medical improvement is specifically defined in the regulations.

> Medical improvement is any decrease in the medical severity
> of your impairment(s) which was present at the time of the
> most recent favorable medical decision that you were disabled
> or continued to be disabled.  A determination that there has
> been a decrease in medical severity must be based on changes
> (improvement) in the symptoms, signs and/or laboratory
> findings associated with your impairment(s). . . .

20 C.F.R. § 404.1594(b)(1).  As stated above, MI is only one part of the termination

analysis.[7]  First, the Commissioner finds that there is medical improvement, and then,

based upon whether that improvement is related to the plaintiff's ability to perform

work, the analysis continues.  Ultimately, the Commissioner will determine whether,

notwithstanding the medical improvement, the plaintiff is still disabled.

### B.  Application

As stated above, the ALJ found that plaintiff was disabled until October 31,

---

[7] It has been noted that the termination analysis is employed "most commonly" at subsequent continuing review proceedings, it has also been held that this standard is appropriate at the determination of initial applications, such as this case, which result in the award of benefits for "closed periods." *See Hicks v. Comm'r of Soc. Sec.*, No. 3:14-CV-72, 2015 WL 58385, at *2 n.4 (N.D.N.Y. Jan. 5, 2015) (citing cases approving the termination analysis in initial application cases where the ALJ finds a closed period of disability).

2012, but that starting November 1, 2012, plaintiff's disability ceased. The ALJ analyzed the issue under the termination standard, finding that plaintiff had medical improvement which affected his ability to work. (T. 20-21). The only difference in the RFC after November 1, 2012, was that plaintiff would no longer require "unscheduled breaks" or be "off-task" for more than 15% of the day. (*Compare* T. 17 *with* T. 21).

At the hearing, when the VE was asked a hypothetical including the "off-task" limitation and without the "off-task" limitation. (T. 46-49 (no "off task" limitation), 49-51 ("off-task limitation)). With no "off-task" limitation, the VE testified that there were sedentary jobs that the plaintiff could perform, but with the "off-task" limitation (including unscheduled breaks), there were no jobs available to such an individual. (*Id.*) Thus, the issue in this case is whether there is substantial evidence to support the ALJ's finding that as of November 1, 2012, plaintiff would no longer be "off-task" due to his impairments, including pain, for more than 15% of the day.

In making the determination that plaintiff was no longer disabled, the ALJ cited various medical reports, with particular emphasis on a report dated November 1, 2012. (T. 21). The ALJ stated that beginning on November 1, 2012, "the treatment record no longer supports Brown's allegations of disabling impairments." (*Id.*) On November 1, 2012, PA Erin Scullion from the New York Spine and Wellness Center, stated that the plaintiff had a left, lumbar medical branch nerve block. (T. 456). PA Scullion states that plaintiff had increased pain for two weeks after the block and then noticed "minimal relief." PA Scullion stated that plaintiff reported an "improvement in his ability to walk for longer periods of time as well as sit more comfortably." (*Id.*)

However, PA Scullion also said that plaintiff noticed only 10% pain relief. Plaintiff told PA Scullion that this was the ***first time*** that he noticed any difference because the lumbar transforaminal nerve blocks provided no relief. (*Id.*)

The ALJ also focused on the fact that PA Scullion never mentioned any limitations on plaintiff's ability to work in the November 1, 2012 report. (T. 22). This comment is presumably based on the fact that on August 8, 2012, NP Profetto stated in his report that plaintiff had no relief from the nerve block, and the "patient's functional status is limited in the following areas, aerobic activity, ability to work and antalgic gait." (T. 452). However, the fact that a different provider mentioned limitations on plaintiff's abilities in a previous report does not indicate that plaintiff's abilities had changed simply because PA Scullion did not happen to mention the same limitations in a subsequent report. In fact, in the part of the ALJ's decision, granting benefits, he states that although he considered NP Profetto's opinions, he gave them less weight because he was not an "acceptable medical source."[8] (T. 18). PA Scullion's report was co-signed the next day by Raymond Alcuri, M.D. (T. 459). However, it is clear from the electronic signature that PA Scullion was the "author" of the report. (Id.)

The ALJ then cited medical reports from prior to November 1, 2012, stating that plaintiff had begun to show improvement prior to the date that his disability ceased. In

---

[8] The regulations indicate that a PA is not an acceptable medical source to *establish* an impairment, however, a PA's opinion may be considered in determining the extent of the plaintiff's restrictions based on the diagnosis of an acceptable medical source. 20 C.F.R. §§ 404.1513(d)(1); 416.913(d)(1). The ALJ never mentioned the fact that PA Scullion was not an acceptable medical source when discussing her November 1, 2012 report. Nor did the ALJ mention that he had discounted NP Profetto's reports earlier because he was not an "acceptable medical source" when he was citing to one of his reports in the medical improvement section.

making this determination, the ALJ cited the report of Kalyani Ganesh from 2011, which stated that plaintiff had "no sitting limitations." (T. 21). However, this is the same report to which the ALJ gave "limited weight" because it "represent[ed] only a snapshot of the claimant's abilities, and [was] inconsistent with treating source limitations during the relevant period." (T. 18). There is no updated report from Dr. Ganesh, and it is unclear how his report would have been less of a "snapshot" of plaintiff's abilities, more than one year later, on November 1, 2012.

The ALJ essentially found that plaintiff's ability to sit and walk more comfortably after the nerve blocks, together with his "improvement" prior to the date that disability ceased, would allow him to be "on-task" sufficiently to meet employer requirements and thus, he would no longer be disabled as of November 1, 2012. This court does not agree that the ALJ's findings were supported by substantial evidence on the records before him.

As stated above, the ALJ used PA Scullion's report and the plaintiff's alleged "improvement prior to November 1, 2012. While the report does state that after the nerve block, plaintiff ultimately got some relief from the injections, the report also states that the plaintiff had two weeks of *increased pain* before he got the 10% relief. (T. 456). PA Scullion *increased* plaintiff's narcotic pain prescription so that he could use a higher dose for the anticipated two weeks of post-procedural pain. (T. 458). If plaintiff's pain was higher for two weeks after the procedure, and he got the nerve blocks approximately every other month, there is no substantial evidence that he had regained an ability to meet an employer's expectation that an employee could be absent

only three days every two months. (*See* T. 49) (VE's testimony regarding employers' expectations). This report is not substantial evidence that plaintiff would be able to be "on task" for the time required to perform a full range of sedentary work.

There is no substantial evidence, based on one report indicating that plaintiff's pain was slightly improved (after being worse for two weeks) after a nerve block, that plaintiff would be able to maintain a full-time competitive work schedule. There is also no substantial evidence to show that simply because plaintiff stated that he could walk and sit more comfortably, he would no longer be "off-task" for more than 15% of the work day.

In addition, plaintiff's records show that he has a history of improvement after surgery/treatment, only to have his condition become worse. (*See* T. 403). On November 15, 2011, plaintiff complained to the PA who worked for his treating surgeon, that he felt better after his July, 2011 surgery, but he had a slight increase in his pain. (T. 403). A subsequent report, dated February 28, 2012, states that plaintiff's pain worsened to the point where he had to quit physical therapy due to the pain. (T. 415). The provider noted that plaintiff was seven months post-surgery, but was still requiring a lot of pain medication. (*Id.*) Thus, plaintiff has had a history of temporary improvement, together with a worsening of his condition. On March 22, 2012, he was referred to the New York Spine and Wellness Center for pain management. (T. 419). Thus, plaintiff's temporary "improvement" that he mentioned to PA Scullion was not substantial evidence that he could return to sedentary work on November 1, 2012.

Without the November 1, 2012 report to rely upon, the ALJ's citation of

21

plaintiff's alleged "improvement" prior to November 1, 2012 does not provide substantial evidence that plaintiff's disability ceased.

## VII.  EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

### A.  Legal Standards

"While evidence submitted to the Appeals Council becomes part of the administrative record, *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir.1996), the Appeals Council . . .  will consider new evidence only if (1) the evidence is material, (2) the evidence relates to the period on or before the ALJ's hearing decision, and (3) the Appeals Council finds that the ALJ's decision is contrary to the weight of the evidence, including the new evidence."  *Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010); 20 C.F.R. §§ 404.970(b), 404.976(b), 416.1470(b), 416.1476(b); *see also Baladi v. Barnhart*, 33 F. App'x 562, 564 (2d Cir. 2002) (new evidence forms part of the administrative record under review "only to the extent that it relates to the time frame encompassed in the ALJ's decision").

"Materiality requires that the new evidence not concern 'a later-acquired disability or the subsequent deterioration of the previous non-disabling condition.'" *Pearson v. Astrue*, 1:10-CV-521 (MAD), 2012 WL 527675, at *11 (N.D.N.Y. Feb. 17, 2012) (*citing Estevez v. Apfel*, 97 Civ. 4034, 1998 WL 872410, at *7 (S.D.N.Y. Dec. 14, 1998)).  Where, as here, the Appeals Council determined that the new evidence submitted did not relate to the period on or before the ALJ's decision, "[t]he role of the district court is to determine if the Appeals Council erred when it determined that the new evidence was insufficient to trigger review of the ALJ's decision."  *Pearson v.*

*Astrue*, 2012 WL 527675, at *11 (*citing Edwards v. Astrue*, 5:07-CV-898 (NAM/DEP), 2010 WL 3701776, at *7, n. 12 (N.D.N.Y. Sept. 16, 2010)).

## B.    Application

The ALJ commented in his opinion that there was "no new opinion evidence from November 1, 2012 onward." (T. 22).  Plaintiff submitted opinion evidence from the New York Spine and Wellness Center which discussed plaintiff's condition in January 2013 and April 2013. (T. 463-69).  The Appeals Council rejected this evidence by stating that the additional medical evidence does not provide a basis for changing the ALJ's decision. (T. 3).  The Appeals Council also found that the "new information" was from a "later time," and therefore "does not affect the decision about whether you were disabled beginning on or before March 5, 2013." (*Id.*)

The Appeals Council appears to have treated this case as one in which no disability was found prior to the March 5, 2013 date of the ALJ's decision, rather than a case in which the ALJ found a closed period of disability and subsequent medical improvement.  The ALJ commented that the November 1, 2012 report showed improvement, and there were no records after November 1, 2012.  Clearly there are subsequent records, and they cast further doubt on whether the alleged "improvement," presumably shown in the November 1, 2012, was permanent.

In fact, NP Profetto's report dated April 22, 2013,[9] and co-signed by Dr. Anne

---

[9] There were two narrative reports from NP Profetto.  One was dated January 28, 2013. (T. 463-465).  The January 28th report is also co-signed by Dr. Anne Calkins. (T. 465).  This report is less detailed than the April 22, 2013 report, but does indicate that the progression of plaintiff's pain is worsening, his gait was normal, and that he had a previously successful medial branch nerve block. (T. 464-65).

Calkins, is evidence that plaintiff's condition did not improve, notwithstanding the nerve blocks. On April 22, 2013, plaintiff was again seen for another "post-block" examination. Plaintiff stated that the pain changed with the weather, the progression of the pain was "worsening," and "anything other than laying in bed" exacerbated the pain. (T. 466). Plaintiff had no pain relief on a "radio frequency ablation on the left."[10] (*Id.*) Plaintiff was again having difficulty sleeping, difficulty walking, and suffering from muscle pain/spasm. (*Id.*)

The April 22, 2013 physical examination showed that he was in mild distress, his gait was mildly antalgic, and there was tenderness on palpation of the lumbosacral spine at L4-5. (T. 467). Plaintiff had tenderness on palpation of the left and right sciatic notch. PA Profetto states that "[r]ange of motion increases pain, [but there was] [n]o luxation or sublaxation."[11] (*Id.*) The report also states that flexion, extension, left and right rotation were painful. However, there was normal hip flexion and extension bilaterally. (*Id.*) The plaintiff's oxycodone medication was continued, and the narcotic information was reviewed with plaintiff, including all side effects and a warning that he not drive or operate heavy equipment or machinery while he was taking the medication. (T. 468). Future nerve blocks were planned. (*Id.*)

The updated reports, although clearly dated after the ALJ's decision, are very

---

[10] Radio frequency ablation is a procedure where an electrical current produced by a radio wave is used to heat up a small area of nerve tissue, which can decrease the pain signals from that specific area. www.webmd.com/pain-management/radiofrequency-ablation#4.

[11] While the first part of the range of motion test states: "ROM normal, flexion, extension and rotation normal without pain," the second part is as cited above, and indicates that range of motion increases pain. Every movement is noted as being "painful." (T. 467).

relevant to the ALJ's finding of medical improvement, particularly since he mentioned in his decision that there were no reports "after" November 1, 2012. These subsequent reports could have influenced his decision. Thus, the Appeals Council erred in finding that the records were not relevant to the time period, and the case should be remanded for further proceedings to properly consider whether plaintiff's purported improvement lasted long enough for him to return to sedentary work.

## VII. <u>CREDIBILITY</u>

### A. **Legal Standards**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's

symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

### B. Application

The ALJ found that plaintiff's claim of disabling limitations was no longer credible after November 1, 2012 because, while plaintiff's "medically determinable impairments could reasonably be expected to produce the types of symptoms alleged," his statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (T. 21). The ALJ noted that there was also "treatment non-compliance" because plaintiff continued to smoke even though he was told to quit. (T. 21).

The ALJ stated that he believed the plaintiff prior to November 1, 2012 because his claims were allegedly consistent with the medical evidence, but did not believe plaintiff after November 1, 2012 because one nerve block allowed plaintiff to feel

better temporarily, to walk longer, and to sit more comfortably. Although the ALJ discusses the other medical records in conjunction with the November 1, 2012 report, all the records he discusses are prior to the alleged cessation date, and most of them were discounted in the first part of the ALJ's opinion. Thus, plaintiff's allegations are not necessarily inconsistent with the medical evidence, showing that plaintiff had temporary periods of improvement only to have his pain worsen. Because this court has found that remand is necessary to consider the 2013 records for purposes of cessation of disability, the Commissioner should reassess credibility on the basis of the 2013 records because the records may also affect the ALJ's credibility finding.

In his discussion of credibility, the ALJ also mentions that there is "evidence of treatment non-compliance, as Brown continues to smoke despite treatment advice to quit." (T. 21). On August 11, 2011, plaintiff was seen for a post-operative examination at his surgeon's office. (T. 391-94). The report is electronically signed by PA Cullinan and surgeon Dr. Thomas Haher. (T. 393-94). The report states that plaintiff is "doing quite well," but that he was "still smoking" although he stated that he had "cut down." (T. 393). Plaintiff was told that "smokers have poor outcomes with this operation and that he needs to cut down even more if not quit. Quitting would ultimately be the best in terms of the healing process." (*Id.*) There is a brief notation in the November 1, 2012 report that plaintiff is a "current smoker." (T. 457).

During the hearing, plaintiff testified that he still smoked half a pack per day. (T. 35). The ALJ stated that he just knew from "having a lot of hearings dealing with back surgeries usually the surgeons, the back surgeons, will recommend stopping smoking

because it can actually inhibit the healing process with the surgery." (*Id.*) Plaintiff admitted that he was told to quit smoking, and stated that he did quit, for the first six months after surgery, but that after no improvement, and the stress he was under, he started smoking again. (*Id.*)

It has been held that "'given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health." *Goff v. Astrue*, 993 F. Supp. 2d 114, 128 (N.D.N.Y. 2012). In *Goff*, the plaintiff had COPD, and smoking was arguably much more critical to the impairment than the smoking in this case. The court in *Goff* stated that "a claimant's failure to quit smoking will generally be 'an unreliable basis on which to rest a credibility determination.'" *Id.* (quoting *Riechl v. Barnhart,* No. 02–CV–6169, 2003 WL 21730126, at *13 (W.D.N.Y. June 3, 2003) (quoting *Shramek v. Apfel,* 226 F.3d 809, 812–13 (7th Cir.2000)). The court also held that to the extent that it was proper for the ALJ to consider plaintiff's smoking as a basis for discounting her credibility, he was obliged to consider any explanations for plaintiff's failure to comply. *Id.*

In this case, the ALJ never mentioned the explanation that plaintiff gave at the hearing. Plaintiff testified that he tried to cut down, he even quit for a while, but then started again due to stress and the failure to improve. (T. 35). He was honest about his smoking, and based on *Goff*, the ALJ's rejection of plaintiff's credibility based on plaintiff's failure to quit smoking, without more, is error. The court would also point out that the ALJ did not reject plaintiff's credibility on this basis prior to November 1, 2012, even though plaintiff was told in 2011 by a PA that it would be beneficial for him

to quit smoking.[12]

## VIII.  <u>VOCATIONAL EXPERT</u>

### A.    **Legal Standards**

At step five of the disability analysis, the burden of proof shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  In the ordinary case, the ALJ carries out this fifth step by applying the applicable Medical-Vocational Guidelines ("the Grids").  *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)).  But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert ("VE").  *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

If the ALJ does use a VE, he presents the expert with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job.  *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).  The ALJ may rely on a VE's

---

[12] Defense counsel also argues that a proper basis to discount plaintiff's credibility is his testimony that "sometimes he did not take his pain medication." (Def.'s Br. at 9) (citing T.34). Defense counsel also cites a variety of daily activities from the May 2011 report of R. Fletcher. (*Id.*) (citing T. 231).  First, the ALJ never mentions either of these bases in his decision rejecting plaintiff's credibility after November 1, 2012. (*See* T. 21-22).  However, if the ALJ had asserted these bases for rejecting plaintiff's credibility, neither would have been supported by substantial evidence.  The court must point out that plaintiff testified that he was not on his Oxycodone "right at this second, because I had to drive to this hearing." (T. 34).  Earlier, he testified that he cannot drive when taking the narcotic medication. *Id.* Thus, plaintiff's effort to get to his hearing does not impair his credibility.  Second, the daily activities cited by defense counsel appear in the report of a non-examining disability analyst, to whom the ALJ specifically gave "limited weight," and who rendered his opinion during the time that the ALJ found plaintiff to be disabled. (*See* T. 231).

testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009). Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper. *Id*. at 276-277. Conversely, a VE's opinion in response to an incomplete hypothetical question cannot provide substantial evidence to support a denial of disability. *See DeLeon v. Sec'y of Health and Human Servs.*, 734 F.2d. 930, 936 (2d Cir. 1984) (finding that, as a result of the ALJ's failure to present the full extent of the claimant's physical disabilities to a vocational consultant, the record provided no basis for drawing conclusions about whether the claimant's impairments rendered him disabled).

### B. Application

Plaintiff argues that the VE's testimony cannot support the ALJ's determination that plaintiff was no longer disabled beginning November 1, 2012. The court notes that the only difference between the RFC which would allow plaintiff to work and the RFC which renders him disabled is his alleged inability to be on-task for the amount of time required to maintain employment. The VE testified that if plaintiff had to be off task for more than 15% of the time, he would not be able to perform any substantial gainful activity. Because this court has found that the ALJ's removal of that restriction was not supported by substantial evidence, the ALJ cannot rely on the VE's testimony to find that plaintiff can work.

## IX.    REVERSAL OR REMAND

### A.    Legal Standards

The court must now determine whether remand for additional proceedings or reversal with a remand for calculation of benefits is appropriate.  Remand to the Commissioner for further development of the evidence is appropriate when there are gaps in the administrative record or where the ALJ has applied an improper legal standard. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).  Reversal for calculation of benefits is appropriate only if the record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no useful purpose. *Id.*

### B.    Application

In this case, the ALJ did not have substantial evidence to show that plaintiff was no longer disabled after November 1, 2012.  He did not have the opportunity to review the reports in the record dated in 2013 which showed that plaintiff's improvement after the nerve blocks was temporary.  Additionally, the ALJ improperly discounted plaintiff's credibility.  Thus, this court will remand for further proceedings consistent with this opinion.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **REVERSED**, and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk

of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: July 2, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge